GOFF & HEGER et al., Appellants, v. GEORGE L. WALKER
et al., Appellees.

PRINCIPAL AND AGENT: Former Agent Contracting in Own Name. Termination in good faith of the relation of principal and agent necessarily leaves the agent free to then contract in his own right with reference to the subject-matter of the former agency.

*Appeal from Polk District Court.—*LAWRENCE DE GRAFF, Judge.

NOVEMBER 22, 1919.

SUIT in equity for an accounting of profits realized by the defendants as alleged agents of the plaintiffs, or as associates in a joint undertaking. There was a trial on the merits, and a decree dismissing the petition.—*Affirmed.*

*Brockett, Strauss & Shaw,* and *Henry, Alberson & Henry,* for appellants.

*Stipp, Perry, Bannister & Starzinger,* and *Strock, Wallace & McConlogue,* for appellees.

EVANS, J.—All the parties to this case other than Wallace & Linnane are members of the Master Plumbers' Association of Des Moines. This association consists of 16 members, 12 of whom are plaintiffs herein, and 4 of whom are defendants. The 16 members of this association joined together in a concerted effort to obtain from defendants, Wallace & Linnane, a subcontract for installing the plumbing in the construction of the government cantonment at Camp Dodge. The principal contract for the construction of the cantonment had been let to Weitz & Sons. Weitz & Sons sublet the plumbing to Wallace & Linnane. Wallace & Linnane proposed to share this contract with the total membership of the Master Plumbers' Association. The negotiations to that end, however, fell through. Later, Wallace & Linnane did share the contract with the four defendants. Because these four defendants, or some of them, had previously acted as a committee in the negotiations between Wallace & Linnane and the membership of the association as a whole, it is contended that the acceptance by them on their own behalf of a contract with Wallace & Linnane was a breach of duty on their part towards their associates, and was a violation of fiduciary relations.

The fighting issue in the case is one of fact. The record is voluminous, and we will deal with it only in its general features.

The Master Plumbers' Association is a trade organization, and not a corporation for profit. It could not, therefore, be deemed a party to the alleged contract, or to any negotiations looking thereto. The members of this association are competitors in trade, and ordinarily sustain no fiduciary relations toward each other. If the proposed joint adventure involved a secret agreement to stifle competition, while carrying before the public an appearance of competition, equity would turn away its ear. But this is not such a case. Competition was not invited among bidders. The government had fixed the compensation at net cost, plus a profit of 10 per cent on a net cost of $100,000, and a profit of a smaller percentage on a sliding scale on a net cost of over $100,000. In obtaining such contract and its subcontract, therefore, the race appears to have been to the swift, rather than to the strong. Wallace & Linnane (not members of the association) obtained the subcontract for all the plumbing, in a race therefor with the membership of the association: that is to say, the membership, acting together, sought to obtain such contract. Wallace & Linnane, being successful, thereupon, on June 30, 1917, addressed a letter to seven members of the association, proposing to share the contract with the membership of the association on a proposed basis of a division of the profits. At a meeting of the membership, this basis of division was approved, and a committee was thereupon appointed, to formulate the details of a written contract, to be signed by Wallace & Linnane, on the one part, and by the several members of the association, on the other. This committee consisted of the four defendants, Walker, Corcoran, Rosene, and Thomas. The members of this committee were also to act as an advisory committee, and as superintendents

in the prosecution of the work, in the event that the final details of the contract were agreed upon. The proposed contract contemplated that the members of the association would turn into its performance their full force, as far as needed. Haste was necessary. Wallace & Linnane immediately submitted to the committee a proposed written contract. This was submitted by the committee to the association at its meeting, and the same was rejected. The committee, therefore, formulated a written contract, which was satisfactory to the association; but this was rejected by Wallace & Linnane. A second contract was formulated by the committee as satisfactory to the association, and this was rejected by Wallace & Linnane. The respective attorneys of the parties finally got together, and agreed upon a form of contract which each recommended to his clients. The contract so recommended was not accepted by Wallace & Linnane, nor was it acted upon in any formal sense by the membership of the association.

This was the condition of affairs up to July 26th. Wallace & Linnane had been under the necessity of beginning work as early as July 7th. The practical difficulty of dealing with so many persons had loomed quite large. A question of the liability of the entire membership of the association for the wrongdoing or neglect of any member thereof in the performance of the contract was involved in disagreement. Some members of the association were deemed of doubtful responsibility financially. It was deemed necessary to create a working fund of $30,000, which amount would have to be borrowed upon the credit of those financially responsible. This presented a difficulty. The question of the selection of superintendents over foremen, and the time to be devoted by the different members to general oversight of the work, presented differences. These are illustrated by the following testimony of Corcoran:

"The question of whether or not we would unite in co-

operating and mutually performing this work at the cantonment came up at every meeting. It was hard for us to get an understanding as to who would do the work and what portion they would do, and so on; as to salaries paid, and so on. Mr. Van Dyck said he could not go out; his business was in such shape he could not; it was impossible for him to go and take any part in it. Mr. Willey said he would not go; said he did not see anything to it, to neglect his business and go out; and said he would let it go. After these letters were handed to us by Mr. Wallace, I had a conversation with Mr. Goff concerning superintendents. Under this provisional arrangement, Goff was in my department. He said he would be damned if he would take any orders from me; would not go out there and work under me,—let me be his boss. He could get plenty of work in town, and he would not go out there; he would stay in town."

Of the two contracts formulated by the committee, neither of them was signed by all the members.

Thereupon, on July 26th, Wallace & Linnane withdrew their proposition, and terminated all negotiations with the association and its membership as such. This was done formally, by letter sent to the president of the association, and read by him at a meeting of the association on the following day.

Thereafter, on the evening of July 28th, Wallace & Linnane sought an interview with these four defendants, and proposed to share the subcontract with them on the general basis originally proposed to the association membership. Thereafter, on July 30th, a written contract was entered into between Wallace & Linnane on the one hand and the four defendants on the other.

The crucial question of fact in the case is whether the negotiations between Wallace & Linnane and the four defendants, on their own behalf, began prior to July 28th,

and whether the four defendants violated in any manner their fiduciary relations to the association members. The fact that these four defendants finally got the fruit for which the association membership was striving was, of itself, a suspicious circumstance, and it calls for the closest scrutiny. The direct testimony of the defendants is all to the effect that they had not, prior to the evening of July 28th, had any intimation from Wallace of such an offer, and that they had, therefore, considered none. Wallace testified that the defendants were in no manner concerned in his termination of the negotiations with the larger membership, and that he did not, until July 28th, communicate to any of them any purpose to share the contract with them. Wallace & Linnane were wholly within their rights. Although they are defendants in this case, no relief is asked against them, other than that they be restrained from paying the alleged profits to the other defendants. It is a circumstance corroborative of the direct testimony that the first offer of Wallace & Linnane to share their contract was made only to a part of the membership of the association, including these four defendants. This offer was promptly declined at that time by these defendants, on the ground that they wanted the entire membership of the association to be included. It was because of this declination that the offer to the whole membership was made. In the attempt to bring about a consummated contract with the whole membership, the evidence does not indicate any lack of effort on the part of these defendants to consummate it. Wallace & Linnane were confronted with the necessity of sharing their contract with some of the master plumbers of Des Moines, or with the necessity of bringing in outside labor. The difficulty of working harmoniously with the entire membership had resulted in an irritating delay. It is not difficult to believe the direct testimony, therefore, that Wallace & Linnane did, of their own volition, determine to re-

duce the multiplicity of parties to the contract. In so do-
ing, they were clearly within their rights.

It is urged, however, by the appellants that these four
defendants were still the agents of their associates, and
that they could not take for themselves what they had fail-
ed to acquire for their principals. But the question wheth-
er they violated any legal duty depends upon the nature
and scope of their alleged agency. The scope of agency of
these defendants is set forth in the petition, in substance,
as follows:

"That, on or about July 7, 1917, said James A. Wal-
lace, on the authorization and consent, and for and on be-
half of the individual members of the said Master Plum-
bers' Association, appointed an advisory committee from
the members of said association, to reduce, or cause to be
reduced, or to aid in the reducing of, the proposed contract
between the Wallace & Linnane Company and the individ-
ual members of the Master Plumbers' Association into writ-
ing. That said advisory committee, consisting of M. J. Cor-
coran, representing himself, George L. Walker, represent-
ing himself, John Thomas, representing the Thomas Plumb-
ing Company, and C. W. Rosene, representing the Des
Moines Plumbing & Heating Company, and all collectively
representing the members of the Master Plumbers' Asso-
ciation, as agents in the negotiation between the Wallace
& Linnane Company and members of the association, for
the purpose of reducing the agreement hereinbefore men-
tioned to writing, and in completing a contract between
the said parties for the installation of the plumbing at the
said cantonment."

It will be seen from the foregoing that the scope of the
agency was a definite and narrow one. They were simply
to formulate a contract which should prove satisfactory to
both the contracting parties. They had no discretion in the
final acceptance of the contract. The proposed contracts

formulated were all presented to the membership of the association. Every member reserved to himself the right to approve or disapprove any proposed contract which might be formulated by the committee. The duties of the committee, therefore, were narrow and special, if not even clerical, and involved no discretion as to the final acceptance of the contract. It does not appear that any member of the association other than these defendants had accepted or offered to accept the contract insisted upon by Wallace & Linnane. If, therefore, Wallace & Linnane, acting within their rights, withdrew their proposition, and terminated their negotiations with the association, it left nothing for the agency of the defendants to operate upon. Its subject-matter was gone. The termination of the negotiations of necessity terminated the agency as well. *Keegan v. Rock,* 128 Iowa 39. If, therefore, there was no bad faith or breach of duty by the defendants, prior to the withdrawal of the proposition by Wallace & Linnane, then the plaintiffs have no legal cause of complaint. A careful consideration of the evidence does not justify a finding that there was any bad faith or breach of duty on the part of these defendants up to that point. The damaging circumstance that they themselves did later enter into the contract is fairly explained by the attitude of Wallace. The evidence would justify no other finding than that Wallace was wholly responsible for the withdrawal of the proposition; and that, if he had any purpose to submit a similar offer to a smaller number, he did not disclose it to anyone. Their agency having terminated, there was no legal impediment in the way of the defendants to resume competition with their competitors.

It may be noted, also, that two of these defendants, Corcoran and Rosene, did not, in fact, accept their appointment on the committee, and did not act thereon. For the purpose of this discussion, we have assumed that these defendants sustained a fiduciary relation to the membership

of the association up to July 26th, and that a breach thereof would have entitled the plaintiffs to an accounting for the profits of the venture. We have no occasion to pass upon the legal proposition involved in such assumption, nor are we prepared to commit ourselves affirmatively to it. An association of competitors involves some incongruity. Many of the parties hereto are firms and corporations organized to compete for business. Whether joint adventures without competition could be regarded as being within the scope of their organization, we do not consider. Whether the defendant Thomas Plumbing Company and the defendant Des Moines Plumbing & Heating Company could, as corporations, be bound to fiduciary relations to a competitor by the act of any officer or employee thereof, we do not consider. We have assumed, also, that John Thomas, who was the alleged agent, is a party defendant, though he is not such.

We reach the conclusion, upon the larger merits of the case, that there was no bad faith on the part of these defendants prior to the termination of their alleged agency. The judgment dismissing the petition is, therefore,—*Affirmed.*

LADD, C. J., PRESTON and SALINGER, JJ., concur.